The Calso Company, a corporation v. Commissioner.
Calso Co. v. Commissioner
Docket No. 27062.
United States Tax Court
1951 Tax Ct. Memo LEXIS 20; 10 T.C.M. (CCH) 1165; T.C.M. (RIA) 51349; December 13, 1951
*20 The petitioner, over a period of time, loaned money to a partnership in which McCauley, the owner of all of its stock, was a partner. By 1941, the partnership had ceased all active operations and its only asset was its right to receive royalties payable under two license agreements covering patents owned in part by one Winslow, another of the partners, and his wife. By letter dated January 20, 1941, addressed to McCauley and signed by the partners, Winslow and another partnership of which he was a member were purportedly released from any personal liability of Winslow on the above indebtedness. The letter, however, contained no provision releasing or purporting to release any of the partners other than Winslow from personal liability for the debt to petitioner. McCauley, at all times during his lifetime, was solvent and financially able to pay the indebtedness owing by the partnership to the petitioner and after his death his estate was likewise solvent and financially able to pay the indebtedness. Held, that the unpaid portion of the debt owing to the petitioner by reason of its advances to such partnership did not become worthless in 1945, and that the petitioner is not entitled *21 to the bad debt deduction claimed. Elmer James McGuire, Jr., Esq., for the petitioner. T. M. Mather, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against the petitioner of $3,279.96 for the calendar year 1945. The sole question for determination is whether the petitioner is entitled to a bad debt deduction. Findings of Fact The petitioner is a California corporation, and at all times material herein maintained its principal place of business in San Francisco, California. It filed its income tax return for the taxable year 1945 with the collector of internal revenue for the first district of California. All of the petitioner's stock was owned by James B. McCauley and, except for the directors' qualifying shares, was issued in his name. The petitioner, over a period of years, loaned funds to the Winslow Manufacturing Company, and its books reflect the latter company's charges, credits and balances, as follows: Date
Description
Charges
Credits
Balance
1927
Dec. 31
Balance
$56,388.48
$56,388.48
1928
Dec. 31
To cash
500.00
56,888.48
1929
Dec. 31
56,888.48
1931
March
By cash
$ 5,957.22
50,931.26
July 31
To cash
1,079.00
52,010.26
1937
April
To cash
5,668.75
46,341.51
Dec. 1931
as of April 1937 - to credit C. A. Winslow note
200.00
46,541.51
1941
Dec. 31
Payment, retained by J. B. McCauley
18,471.50
28,070.01
1942
Dec. 31
Payment, retained by J. B. McCauley
5,000.00
23,070.01
1945
Jan. 31
Cash Book
9,900.00
13,170.01
Dec. 31
Written off as a bad debt, 1945
13,170.01
0
*22 The Winslow Manufacturing Company was a partnership composed of James B. McCauley, Charles A. Winslow and Charles F. Green, whose interests were respectively seven-sixteenths, six-sixteenths and three-sixteenths. Winslow is an engineer, and has invented a number of devices. He and McCauley had been associated in business, development or promotional ventures, to some degree, since 1916 or 1917. A man by the name of Elbert J. Hall was co-inventor with Winslow of some devices. Between them they obtained patents on nine inventions during the period from August 9, 1927 to April 2, 1935, and on the latter date, Winslow had pending three applicatiions for patents. Of the nine patents issued, six had been issued to Winslow and Hall jointly, two to Winslow and one to Hall. The Winslow patents and his interest in the Winslow-Hall patents either stood in his name or had been assigned to his wife, Catherine B. Winslow. Hall was a member of a partnership, Hall-Scott Motor Car Company, which had cooperated with the two inventors in the development of some of their joint inventions and through Hall, had an equity in them. The Hall-Scott Motor Car Company was later sold to the American Car & *23 Foundry Securities Corporation, which thereby obtained the Hall-Scott equity. Originally the Winslow Manufacturing Company manufactured carburetors. Later it cooperated in the development of other automotive equipment, of which their oil and air filters were the most successful. It had contributed, in some degree, to Winslow's work leading to the above inventions, and on that basis and the mutual understanding springing from the relationship between McCauley and Winslow, Winslow Manufacturing Company became entitled to an interest in the royalties which might come to Winslow from the said inventions. As of October 1, 1935, the American Car & Foundry Securities Corporation, Charles A. Winslow, Catherine B. Winslow and the Winslow Manufacturing Company, as licensors, entered into a non-exclusive license agreement with Michiana Products Corporation, an Indiana corporation, as licensee, covering the above patents and the three applications for patents which Wilnslow had pending. Under the license agreement, Michiana was granted the non-exclusive right throughout the United States to manufacture oil filters and parts thereof embodying any of the inventions and to sell and deliver the *24 filters and parts anywhere. A royalty of five per cent was to be paid, one-half to the American Car and Foundry Securities Corporation and one-half to Winslow Manufacturing Company. The licensors agreed with Michiana that they would "use their best efforts to end competition by the manufacture and/or sale of oil filters or parts thereof in infringement of said patents." Of the patents so licensed, two involving oil filters and a lubricating system were the most important. These two patents had been issued in the period 1930 to 1933. The above-named licensors, on December 30, 1940, entered into a similar license agreement covering the same patents with Purolator Products, Inc., as licensee. The effective date of this contract was January 1, 1940. At the time this agreement was entered into, patents had been issued on the three applications which Winslow had pending. As consideration for the agreement, the licensee, in addition to its promise to pay royalties from the contract date, paid to the licensors $15,984.12 in cash to cover royalties for the years 1937, 1938 and 1939. The licensors released Purolator "and all customers and users of its equipment for any and all claims for infringement *25 of said Letters Patent on account of oil filters or filtering systems or parts thereof manufactured and sold by the Licensee prior to January 1st, 1940." Purolator was also granted the privilege of discontinuing payment of royalties in case there was substantial unlicensed use of the inventions covered by the agreement. By 1941, Winslow Manufacturing Company had eliminated its manufacturing plant and it had no assets other than its royalty interest in the Winslow and Hall patents which were covered by the license agreements to Michiana and Purolator. It was receiving very little in royalties under these agreements and the licensees were threatening to stop all further payments, unless the licensors became active in the promotion and development of the devices covered by the patents. In January of 1941, Winslow, McCauley and Green endeavored to reach some sort of settlement, with a view to closing up the affairs of the Winslow Manufacturing Company. Conferences were held and, as the result, a settlement agreement was reached, which agreement was in the form of a letter addressed to McCauley and signed by Winslow, McCauley and Green. This letter was dated January 20, 1941, and was *26 as follows: "January 20, 1941 "Mr. James B. McCauley 400 Ohio Street Vallejo, California
"Dear Jim: "Supplementing the conversation of our meetings of January 12 and 18th, and to avoid additional attorney's cost and delay, I am setting forth in writing the agreement arrived at during our meeting, as per your request: "In consideration of the fact that I, Charles A. Winslow, have agreed to cooperate in concluding the pending contracts with the Purolator Company and others and also in obtaining additional royalties from the present licensees, infringers, and obtaining possible new licensees and my further agreement to waive any claims to money in the Bank of America, Park Boulevard Branch, in the account of the Winslow Manufacturing Company amounting to $6,550.78 and my further agreement to waive any claim to royalties from oil filter patents due the Winslow Manufacturing Company until Jim McCauley has received the sum of $48,741.45 [1] then you, James B. McCauley and Charles F. Green, agree for the Winslow Manufacturing Company and yourselves individually, that the $5,000.00 loan which was made to the Winslow Engineering Company and, which is now deposited in the Central Bank *27 of Oakland in the name of Winslow Manufacturing Compay, shall belong to Charles A. Winslow immediately on payment of all monies due from the Purolator contract, including the 1940 royalties, and that you both further agree on behalf of the Winslow Manufacturing Company and as individuals to release the Winslow Engineering Company, Charles A. Winslow and his partners, from any and all claim or claims of any interest whatsoever, past, present or future, to said Winslow Engineering Company and further agree not to molest or disturb the operations of the Winslow Engineering Company or Charles Winslow and his partners in any manner whatsoever. "It is mutually agreed and understood further that as the royalties from the oil filter patents are received by the Winslow Manufacturing Company, they will be paid as above stated to James B. McCauley up to the amount of $48,741.45 from said royalties, which includes the money now in the account of the Winslow Manufacturing Company in the Park Boulevard Branch of the Bank of America, Oakland; thereafter all the balance of the money coming in from royalties from oil *28 filter patents will be diveded annually or as it is received, as follows: 7/16
thereof to James B. McCauley
6/16
to Charles A. Winslow
3/16
to Charles F. Green
"It is mutually understood and agreed by all the members of the Winslow Manufacturing Company as a company and as individuals, that the patent titles are not to be disturbed, and are to remain in their present status. "It is further mutually understood and agreed that this agreement will cancel any and all former understandings or agreements and revokes and cancels everything prior to this agreement. "It is mutually understood and agreed that in the event of the death of any of the parties hereto that the remaining parties shall have the prior right to buy the interest of the deceased party or parties, and this agreement shall bind the heirs, executors and administrators of all of the parties hereto. "[s] Chas. A. Winslow, Charles A. Winslow [s] J. B. McCauley, James B. McCauley [s] Charles F. Green, Charles F. Green "I hereby certify that I am the legal owner of record in the United States Patent Office of the oil filter patents referred to above and I agree to the terms and conditions *29 of royalty payments as set forth in this letter agreement. [s] Catherine B. Winslow, Catherine B. Winslow * * * *
"I am sending three signed copies, one to Charlie, and suggest that you both also sign all three copies, retain one each and return one to me. "As soon as I receive it, I will bring up the Purolator contracts, we can sign them and then get your money which will be $7,992.06 immediately from the Purolator contract and $6,550.78 from the Bank Account, a total of $14,542.84, plus the 1940 royalties due from the Purolator Company. * * *
"If there are any questions about this that are not clear, would appreciate having you 'phone me. "Hoping to hear from you immediately and with kindest regards, I am "Sincerely, [s] Chas. A. Winslow, Charles A. Winslow" "CAW:LZ McCauley died on December 26, 1942. The stock of the petitioner was thereafter held by his estate until distribution thereof, in the latter part of 1948 or early 1949. There had been some infringement of the above patents at an early date, and as time passed, major infringements occurred. Later, when some of the patents were approaching their expiration dates, it became increasingly difficult *30 to bring infringers to account and the licensees were either refusing to pay further royalties or were impounding them. The possibility of bringing infringers to account by legal action was explored by both Winslow and one O'Hara, who was counsel for the petitioner and one of the executors of McCauley's estate. They were advised by a patent attorney, who was regarded by them as being outstanding in his field, that such litigation would be very costly and that there was little possibility of success. The American Car & Foundry Investment Corporation, which had succeeded the American Car & Foundry Securities Corporation, was advised by its patent counsel against bringing such litigation and that company refused to join the Winslow Manufacturing Company in any proposed suit. In 1943, O'Hara began pressing the Winslow Manufacturing Company for payment of the balance due and owing to the petitioners, which at that time was $23,070.01. Winslow produced the writing of January 20, 1941, claiming that there was no personal liability on the part of the partners of Winslow Manufacturing Company and that the petitioner would have to look to the royalties coming to the partnership from the *31 license agreements. Under one of the license agreements, the partnership was supposed to maintain a fund of approximately $5,000 to service the patents and to prevent infringements. At that time the amount of the fund was approximately $3,200. Winslow offered to pay the petitioner $2,000 from this fund in satisfaction of the debt. That offer was rejected. He then advised O'Hara that negotiations would have to be conducted with his attorney. After the possibility of collecting from infringers had been abandoned, O'Hara further pressed his negotiations with Winslow's attorney. It later developed that in addition to the thirty-two hundred odd dollars in the account of the partnership above mentioned, a comparable amount might be procured from one of the licensees. Winslow, through his attorney, thereafter made an offer of $9,900 to the petitioner in full settlement of the debt. This offer was accepted by the petitioner in January 1945, and payment of the $9,900 was made at the same time. Of the $9,900 so paid, $6,554.55 was from the service fund above described and from one of the licensees. The remainder was paid by Winslow from his own funds. He also paid to McCauley's estate the sum *32 of $100 for McCauley's interest in Winslow Manufacturing Company. One reason O'Hara had for pressing Winslow or Winslow Manufacturing Company for payment of the indebtedness was that McCauley's estate had a substantial estate tax liability standing against it and it desired to obtain part, if not all, of the money required through the distribution of a dividend by the petitioner. McCauley, up to the date of his death, and his estate thereafter, was solvent and amply able to pay the indebtedness owing by Winslow Manufacturing Company to the petitioner. The petitioner at no time made a claim against McCauley or his estate for payment of the indebtedness. The petitioner in its income tax return for 1945 deducted as a bad debt the sum of $13,170.01, being the unpaid balance of the Winslow Manufacturing Company indebtedness. The respondent disallowed the deduction, and in his notice of deficiency explained the disallowance as follows: "(a) The deduction of $13,170.01 claimed as a bad debt is disallowed for the reason that it has not been shown that the account between you and the Winslow Manufacturing Company became worthless during the taxable year. Furthermore, after the agreement *33 between you and Charles A. Winslow was reached during the taxable year, whereby you agreed to account $9,900 in full satisfaction of the indebtedness of $23,070.01, if any debt existed such agreement constituted a gratuitous forgiveness thereof and accordingly, no deduction for a bad debt is allowable." Opinion But for two admissions on the part of the respondent, one in his answer and one at the trial, the disposition of this case would require very little more than a bare statement of conclusion. The debt here in question, the balance of which the petitioner seeks to charge off as worthless, was the balance due on a loan made to Winslow Manufacturing Company, a partnership, in which McCauley owned a seven-sixteenths interest. He was accordingly personally liable for the debts of the partnership and he throughout his lifetime, and his estate after his death, was at all times solvent and able to pay the indebtedness. Furthermore, there is nothing in the agreement evidenced by the letter of January 20, 1941, which releases any persons or firms from liability other than Winslow and the Winslow Engineering Company, another partnership in which Winslow was a partner. Certain it is *34 that the writing contains no provision which in any way would relieve McCauley of his individual liability. Such being the situation reflected by the facts prior to the said writing and by the writing itself, the petitioner rather plainly has no case except and unless that case is made by the admissions of the respondent above referred to. While there is nothing appearing on the face of the so-called settlement agreement which in any way gives any indication that the petitioner was a party to the arrangement worked out, that it released anyone from any liability to it, or that any of its rights or interests were modified or changed by the agreement, the respondent's counsel at the trial, apparently for the sake of moving the trial to a conclusion, stated that if it would be helpful to the petitioner's counsel in the presentation of his case, he wuld admit that McCauley was acting for the petitioner in the negotiations which resulted in the understanding evidenced by the writing of January 20, 1941. That admission in and of itself is in reality of no consequence here, for the reason already noted, namely, that the writing contained no provision which would in any way relieve McCauley *35 as a partner in the Winslow Manufacturing Company of his personal liability to the petitioner for the debt. In its petition, however, the petitioner, in subparagraph (2) of paragraph V, has alleged the execution of the writing of January 20, 1941, "whereby petitioner agreed to look solely to the income derived by Winslow Manufacturing Company from royalties collected or to be collected on patents, licensed but not owned, by Winslow Manufacturing Company. That it was the intent of said agreement that the said indebtedness was to be repaid only from royalties, and it was the further intent of said agreement that said indebtedness was not to be a general obligation of Winslow Manufacturing Company. That said agreement contemplated a method of payment by which the income of the Winslow Manufacturing Company would be applied preferentially to said indebtedness and it was considered an advantageous arrangement by petitioner as it in effect set up an indebtedness trust fund upon which petitioner could rely for the repayment of said indebtedness before any distribution of profits or salaries from said royalties could accrue to those having any interest in the Winslow Manufacturing Company. *36 That said agreement effected a release of any individual liability of the partners of Winslow Manufacturing Company as to said indebtedness owed to Calso Company in consideration of preferential rights therein granted Calso Company in respect to the income of Winslow Manufacturing Company from said royalties, said rights excluding said partners from any participation in the profits thereafter to accrue in the form of said royalties until Calso Company was repaid and in effect amounting to an assignment to Calso Company, in consideration of its agreement to look solely to said royalties for repayment, of all proceeds to be derived from said patent licenses." The respondent in his answer admits the execution of the said writing "whereby petitioner agreed to look solely to the income derived by Winslow Manufacturing Company from royalties collected or to be collected on patents by Winslow Manufacturing Company, but denies the remaining allegations contained in subparagraph (2) of paragraph V of the petition." It is thus apparent that whatever the respondent had in mind in the admission quoted above, he not only did not admit, but denied, the allegation "that said agreement effected *37 a release of any individual liability of the partners of Winslow Manufacturing Company as to said indebtedness owed to Calso Company." The proof on the point is limited to the writing of January 20, 1941, and the testimony of O'Hara, who was attorney for Calso and after McCauley's death, an executor of McCauley's estate, and the testimony of Winslow. Certainly the written instrument in and of itself is not evidence of the release from personal liability of anyone but Winslow. As to the testimony of the two witnesses, assuming that we may turn to oral testimony as to the meaning of a writing such as that here involved, it appears that O'Hara had little, if any, knowledge of McCauley's dealings with Winslow Manufacturing Company until after McCauley's death, and his testimony with respect to the writing of January 20, 1941, at the most, was merely an expression of his opinion. Winslow's testimony as to the release of the partners from individual liability is in reality no more enlightening and, in the main, it was given in answer to leading questions. Furthermore, it may be noted in passing that in the conferences which resulted in the final settlement of the indebtedness in 1945, O'Hara *38 was pressing Winslow individually, regardless of the writing of January 20, 1941, and that part of the $9,900 paid in such final settlement came from Winslow individually and not from anything belonging to the Winslow Manufacing Company. It thus appears that in effecting the settlement made O'Hara, who was counsel for the petitioner and an executor of McCauley's estate, was willing to overlook any conclusion he may have entertained that the writing of January 20, 1941, released the partner Winslow of personal liability for the partnership debt. It is accordingly our conclusion that at no time was McCauley, as a partner in Winslow Manufacturing Company, relieved of his individual liability on the indebtedness owing by that partnership to the petitioner; that at all times he was solvent and financially able to satisfy that indebtedness, and after his death, up to and including the taxable year here in question, his estate was likewise financially able to pay the indebtedness. As a matter of fact, O'Hara testified that one reason for pressing Winslow and the Winslow Manufacturing Company with respect to the debt was the desire to build up the earnings of the petitioner in order that *39 distributions might be made by it to McCauley's estate to provide it with funds for satisfying the estate tax liability of that estate. Such being the picture here presented, Clay Drilling Company of Texas, 6 T.C. 324, relied upon by the petitioner, is not in point. The debt did not become worthless in 1945, and the respondent was not in error in denying the deduction claimed by the petitioner. It is unnecessary, therefore, to consider the various arguments made by the parties as to the possible effect on the existence of the debt, of the negotiations and agreement entered into by McCauley as The Calso Company on the one hand and by McCauley as an individual partner of Winslow Manufacturing Company on the other. Decision will be entered for the respondent. Footnotes
1. The amount of this indebtedness was later determined to be $46,541.51.↩